Filed 4/25/13  P. v. Ward CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES V. WARD,<br><br>    Defendant and Appellant. | 2d Crim. No. B231332<br>(Super. Ct. No. SA066108)<br>(Los Angeles County) |

James V. Ward appeals the judgment following his conviction for first degree felony murder while engaged in the commission of sexual penetration (rape by instrument) (Pen. Code, §§ 187, subd. (a), 289),[1] assault on a child causing death (§ 273ab), and child abuse (§ 273a, subd. (a)).  The jury found to be true a special circumstance allegation that the murder was committed during the commission of a rape by instrument.  (§§ 190.2, subd. (a)(17)(K), 289.)  Ward was sentenced to life without possibility of parole for the murder, plus a consecutive three-year term for child abuse and four-year term for child abuse pursuant to section 12022.95.

Ward contends there was insufficient evidence to support the murder conviction or finding on the special circumstance allegation, and admission of surrogate medical testimony violated his Sixth Amendment right of confrontation.  In addition, he

---

[1] All undesignated statutory references are to the Penal Code.

contends the trial court erred by admitting evidence of criminal disposition, failing to give a unanimity instruction, and failing to instruct the jury on lesser included offenses to first degree murder. He also claims ineffective assistance of counsel. We affirm.

FACTS

On September 7, 2007, Ward lived with his wife Deshawn Ward, and three children: his wife's six-year-old son J. and two-year-old daughter K., and her and Ward's infant son J.W. At approximately 5:00 a.m., Mrs. Ward awoke and left for work. Later that morning, Ward walked J. to school accompanied by K. and J.W. At 1:00 p.m., Ward telephoned his wife and reported that K. and J.W. were sleeping. Shortly thereafter, Ward telephoned his wife and told her K. would not wake up. At his wife's direction, Ward called 911. Police reached the home at 2:05 p.m. K. was lying on the floor. An officer could not find a pulse and began performing CPR. Paramedics arrived two or three minutes after the police.

K. was taken to a hospital where she was treated by emergency room physician Sharonda Covington. Dr. Covington restarted K.'s heart and placed her on a ventilator. Dr. Covington's examination revealed that K.'s abdomen was large and rigid, and her rectum was prolapsed. Dr. Covington also noticed that K.'s vaginal opening was larger than would be expected in a two year old and she did not see a hymen. Dr. Covington concluded that K.'s injuries were the result of trauma and reported to the police that K. had been abused.

K. was sent to another hospital for surgery. Pediatric surgeon Roman Sydorak concluded that K. had visible signs of abuse and was critically ill and near death. He reviewed CT scans showing a severe injury to her brain, a perforation of her abdomen, and severe liver damage. During the ensuing surgery, Dr. Sydorak saw an almost split liver, two holes in her intestines, and other injuries. Dr. Sydorak opined that K.'s injuries had been sustained within one to six hours before the operation. K. was removed from the ventilator, and died on September 9, 2007.

On September 11 and 12, Los Angeles County Deputy Medical Examiner David Whiteman performed an autopsy of K. Dr. Whiteman found tearing and bruising

2

of her liver, pancreas and intestines, as well as fractures in her rib cage and injuries to her head, neck and spinal cord. He also found lesions just outside of her hymen and around her anal area, and bruises on the inside of the rectum. Dr. Whiteman opined that the cause of death was multiple traumatic injuries, including injuries to her abdomen, rib cage, and head.

In order to determine the age of K.'s injuries, Dr. Whiteman performed a microscopic examination of the soft tissue injuries, and took X-rays of the bone injuries. Dr. Whiteman testified that injuries begin to heal immediately after their infliction, but that healing would have been very slight during the period of time K. was on a ventilator. Dr. Whiteman concluded that most of K.'s injuries, including bruises inside her rectum, occurred between six and 12 hours before K. was placed on a ventilator at the hospital.

Dr. Astrid Heger participated in the autopsy to assist in determining whether there had been injuries to K.'s anus and vagina. Dr. Heger testified that acute trauma extended around and across the base of her hymen and in her rectum. She concluded that the injuries to K.'s hymen were "fairly recent," and that K. had been penetrated at least once in the anus and at least once in the vagina. Dr. Heger could not determine what object made the penetrations.

DISCUSSIOJN

*Substantial Evidence Supports Felony Murder Conviction*
*And Special Circumstance Finding*

Ward contends there was insufficient evidence to support a conviction for first degree felony murder or a true finding of the special circumstance of murder during the commission of rape by instrument. He argues that there was no substantial evidence of when K.'s injuries occurred or that Ward had a purpose independent of the murder for commission of the sexual felony. We disagree.

In assessing a sufficiency of evidence claim, we consider the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence, that is, "". . . evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'""

3

(*People v. Burney* (2009) 47 Cal.4th 203, 253.)  We presume all facts in support of the judgment which reasonably could be deduced from the evidence, accord the judgment all reasonable inferences from the evidence, and do not reweigh the evidence or redetermine credibility.  (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Martinez* (2003) 113 Cal.App.4th 400, 412.)

Under the felony murder doctrine, a killing is first degree murder whether or not intentional or premeditated when it is committed in the perpetration of certain enumerated felonies, including sexual penetration by foreign or unknown object.  (§ 189; *People v. Coefield* (1951) 37 Cal.2d 865, 868.)  The requisite mental state is the specific intent to commit the underlying felony, not the intent to kill.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)

Felony murder does not require a strict causal relationship between the underlying felony and the homicide provided the killing and the felony are part of one continuous transaction.  (*People v. Cavitt*, *supra*, 33 Cal.4th at pp. 197-198.)  The underlying felony must have an independent purpose, however, and cannot be merely incidental to the murder.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 296.)

Ward argues that prosecution experts disagreed over the time any vaginal or anal injuries were inflicted and, therefore, there is no substantial evidence to tie Ward to the injuries.  He also claims the evidence fails to show an independent purpose for the sexual penetration offense.  The evidence does not support Ward's argument.

The prosecution's theory was that K. was murdered between the time Ward left J. at school and the 911 call.  There was testimony from Dr. Whiteman and Dr. Heger that K. suffered injuries to her vagina and rectum.  Dr. Whiteman testified that these injuries occurred approximately six hours before K. was placed on a ventilator, and Dr. Heger testified that the vaginal injuries were "fairly recent."  Although less specific, the testimony of Dr. Covington and Dr. Sydorak was generally consistent with the opinions of Drs. Whiteman and Heger.  There were also statements by J. regarding events on the morning of September 7, and testimony that there were no signs of forced entry into the Ward apartment.  This evidence establishes that K. sustained her injuries during the

4

morning of September 7 when she was alone with Ward (and an infant child), and constitutes substantial evidence supporting the murder conviction and true findings on the rape by instrument special circumstance. Such evidence is also substantial evidence of an independent purpose for the sexual felony.

Ward argues that Dr. Sydorak and Dr. Covington did not observe all of the injuries to K.'s rectum and vagina that were observed by Dr. Whiteman and that only Dr. Whiteman and to a lesser extent Dr. Heger testified to the age of the injuries. The fact that an emergency room doctor and surgeon trying to save the life of a young child did not closely examine injuries that were not life-threatening does not undermine the substantial evidence provided by Dr. Whiteman and Dr. Heger.

*No Violation of Confrontation Clause*

Ward contends the admission of testimony from Dr. Whiteman concerning the opinions of three other pathologists who participated in the autopsy but did not testify at trial violated his Sixth Amendment right to confront and cross-examine witnesses. We disagree.

Dr. Whiteman testified that he had consulted with three other pathologists during or shortly after the autopsy to obtain further information regarding specific injuries suffered by K. He testified that he consulted with Dr. Hideo Itabashi regarding hemorrhaging in K.'s spinal cord. Dr. Whiteman observed the hemorrhaging during the autopsy and concluded that the hemorrhaging resulted from a trauma. He asked Dr. Itabashi to review his observations and testified that Dr. Itabashi disagreed and believed the hemorrhaging was caused by the respirator and not a trauma. Dr. Whiteman consulted with Dr. Narcin Rao regarding hemorrhaging in K.'s optic nerve. After examining the eye, Dr. Rao agreed with Dr. Whiteman but added that the hemorrhaging consisted of a bilateral hematoma.

Dr. Whiteman consulted with Dr. Bolger regarding K.'s x-rays. Dr. Whiteman and Dr. Bolger examined K.'s x-rays together in Whiteman's offices. There is no evidence of any disagreement between the two doctors regarding interpretation of the x-rays.

5

Ward argues that reports provided by these doctors were prepared in contemplation of a criminal prosecution and, therefore, testimonial statements. As such, Dr. Whiteman's reliance on the reports during his testimony violated Ward's right to confront witnesses against him. We disagree.

Initially, we conclude that Ward's claim has been forfeited because he failed to object to the challenged testimony during trial. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19 [requirement of timely objection in trial court applies to a defendant's Sixth Amendment right of confrontation].) There is no merit in Ward's argument that an objection would have been futile based on the state of the law at the time of trial. Although two United States Supreme Court cases relevant to the issue had not been decided at the time of trial,[2] *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*) was decided more than a year before trial. *Melendez-Diaz* would have alerted reasonable counsel to the possible merit of objections to Dr. Whiteman's testimony regarding the opinions of Drs. Itabashi, Rao and Bolger. Nevertheless, we will consider Ward's claim on its merits because of his assertion that trial counsel's failure to object constituted ineffective assistance of counsel.

In *Crawford v. Washington* (2004) 541 U.S. 36, 59, the United States Supreme Court held that the Sixth Amendment's confrontation clause prohibits admission of "testimonial statements" from witnesses who do not testify at trial unless the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine. *Crawford* did not define what constitutes a "testimonial statement," but concluded that the term included statements prepared for use in a criminal trial. (*Id*. at pp. 51–52.)

Since *Crawford*, the court has considered the "testimonial statement" standard in three cases, but without reaching agreement on a comprehensive definition. (See *People v. Dungo* (2012) 55 Cal.4th 608, 617-618 (*Dungo*).) In *Melendez–Diaz*, a chemical analyst's sworn "certificates of analysis" were admitted as a substitute for live

---

[2] *Bullcoming v. New Mexico* (2011) 564 U.S.____ [131 S.Ct. 2705, 180 L.Ed.2d 610] (*Bullcoming*); *Williams v. Illinois* (2012) 567 U.S. ____ [132 S.Ct. 2221, 183 L.Ed.2d 89] (*Williams*).

testimony to prove the substance possessed by the defendant was cocaine. The Supreme Court held that the certificate was "testimonial" because sworn affidavits are within the core class of testimonial statements covered by the confrontation clause. (*Melendez–Diaz, supra,* 557 U.S. at p. 310.) The court stated that the certificates were "functionally identical" to in-court testimony and were """made under circumstances which would lead an objective witness reasonably to believe . . . """ they would be used in a criminal trial. (*Id*. at pp. 310–311.)

In *Bullcoming*, the court again held that a laboratory analyst's certificate was a testimonial statement. (131 S.Ct. at pp. 2709-2710, 2713.) After a drunk driving arrest, a sample of defendant's blood was tested for alcohol content at a state laboratory and the result of the test was set forth in an unsworn "certificate of analyst." (*Id*. at pp. 2709-2710.) At trial, a colleague familiar with the laboratory's testing procedures testified, but the analyst who performed the blood test did not. (*Id*. at p. 2709.) The court concluded that the analyst's certificate was testimonial. (*Id.* at pp. 2709-2710, 2715, 2719.) The court stated that a document created solely for use in a criminal trial is testimonial. (*Id.* at p. 2717.)

In *Williams*, a four justice plurality concluded that an expert's testimony regarding a DNA profile compiled at an outside laboratory did not violate the confrontation clause. The plurality held that the laboratory report was "basis evidence" to explain the expert's opinion and was not offered for its truth. (132 S.Ct. at pp. 2230, 2235, 2239–2240.) Even if offered for its truth, its admission would not have violated the confrontation clause because the report was not a formalized statement whose "primary purpose" was to accuse a targeted individual for criminal prosecution. (*Id*. at pp. 2242–2244.) Justice Thomas agreed that the report lacked the requisite formality to be testimonial, but rejected any definition of "testimonial" which reached beyond "formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." (*Id.* at p. 2255 (conc. opn. of Thomas, J.).)

After *Williams*, the California Supreme Court reexamined the meaning of "testimonial" in light of *Melendez–Diaz, Bullcoming,* and *Williams*. (*Dungo, supra,* 55

7

Cal.4th 608; *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*); *People v. Rutterschmidt* (2012) 55 Cal.4th 650.)  Interpreting the United States Supreme Court's opinions, our Supreme Court held that, to be testimonial, a statement (1) must be "made with some degree of formality or solemnity," and (2) its "primary purpose" must pertain "in some fashion to a criminal prosecution."  (*Dungo,* at p. 619; *Lopez,* at p. 582.)  A statement prepared for use at trial is not "testimonial" unless it is also "formalized."  ( *Lopez,* at pp. 581-582, 584.)

In *Dungo*, a forensic pathologist performed an autopsy of a murder victim to determine cause of death.  Instead of calling the pathologist who performed the autopsy, the prosecution presented the testimony of his employer, Dr. Robert Lawrence, also a forensic pathologist.  (*Dungo, supra,* 55 Cal.4th at p. 613.)  Dr. Lawrence testified that, based on the autopsy report and autopsy photographs, the victim had died from manual strangulation.  (*Id.* at p. 614.)

In holding there was no violation of the defendant's confrontation rights, *Dungo* concluded that the autopsy report and photographs were not sufficiently formal or solemn to be considered testimonial.  (*Dungo, supra,* 55 Cal.4th at p. 619.)  *Dungo* reasoned that Dr. Lawrence was testifying about objective facts concerning the condition of the victim's body as recorded in an autopsy report, and not about the non-testifying pathologist's conclusions.  (*Ibid.*)  "[S]tatements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions.  They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment.  Such observations are not testimonial in nature.  (*Melendez–Diaz, supra,* 557 U.S. at p. 312, fn. 2 . . . .)"  (*Dungo,* at pp. 619–620, fn. omitted.)

*Dungo* also found the primary purpose of the autopsy report did not pertain to a criminal prosecution.  (*Dungo, supra,* 55 Cal.4th at pp. 619, 621.)  "The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes.  For example, the decedent's relatives may use an autopsy report in determining whether to

8

file an action for wrongful death. And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies." (*Id.* at p. 621.)

Based upon the cases discussed above, we conclude that the forensic reports or analyses relied on by Dr. Whiteman were not testimonial statements and Ward's right to confront witnesses against him was not violated. The consultations and reports from the nontestifying doctors lacked the formality or solemnity required by *Dungo*. The reports were unsworn and uncertified and covered objective facts regarding the condition of K.'s body and the extent and nature of particular injuries. (*Dungo, supra,* 55 Cal.4th at p. 619.) Drs. Itabashi, Rao and Bolger provided assistance to Dr. Whiteman in K.'s autopsy which is the established medical process and procedure to determine the cause of death. The consultations were a joint effort on the part of Dr. Whiteman and the other pathologists. Dr. Whiteman was not a "surrogate" or conduit for presenting the conclusions of other pathologists. The nontestifying pathologists did not present independent findings based on independent testing or analysis.

In addition, we do not conclude that the primary purpose of the autopsy was to assist in a criminal prosecution. The standards for performing an autopsy are medical and not legal. Clearly, the results of the autopsy were utilized in a criminal prosecution because they revealed the presence of traumatic injuries inflicted by another person. The autopsy, however, concerned the condition of K.'s body and did not purport to connect any particular person to the crime. In any event, even if the primary purpose of the autopsy pertained to a criminal prosecution, the reports generated by the autopsy would not be testimonial statements because they lacked the formality required by binding California Supreme Court precedent.

Moreover, any violation of Ward's confrontation rights was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Geier* (2007) 41 Cal.4th 555, 608.) The information provided by the nontestifying pathologists was of minimal importance to Ward's conviction. The information did not pertain to the critical issue tying Ward to the offenses, namely, the

9

time the injuries to K. occurred. The information also confirmed the conclusions reached by Dr. Whiteman based on his own observations and analysis. Dr. Itabashi's opinion that K.'s spinal injury was caused by the respirator was favorable to the defense. Dr. Rao's analysis of the injury to K.'s optic nerve was consistent with Dr. Whiteman's own findings, and there was indication that Dr. Bolger's findings were material or inconsistent with Dr. Whiteman's findings.

*No Error in Admission of Evidence of Prior Discipline*

Ward contends evidence showing that Ward spanked and otherwise disciplined K. prior to the murder was inadmissible evidence of a disposition or propensity to commit the charged offenses. (See Evid. Code, § 1101, subds. (a) & (b).) Ward's claim was forfeited by failure to object to the evidence in the trial court. (*People v. Thomas* (1992) 2 Cal.4th 489, 520.) We address the merits because he makes the alternate argument that "failure to object" constituted ineffective assistance of counsel.

Evidence of a person's character is inadmissible when offered to prove his conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) Evidence that is otherwise inadmissible, however, may be admitted "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Here, K.'s six-year-old brother J. told the police that on the morning of the murder, Ward walked him to school and that K. walked with him holding his hand. He told police that in the past Ward had "whoop[ed]" him with a hand or belt. He also told police that K. regularly got in trouble with Ward for going "pee-pee" and "poo-poo" in her pants and that Ward sometimes hit K. when she did so.

At trial, J. testified that K. was in a stroller during the walk to school, and denied telling the police that Ward ever gave him a "whooping," or that Ward ever hit K.

10

for urinating or defecating in her pants. In response, the prosecutor read the portion of J.'s interview with the police referred to above which contradicted his trial testimony. An audio recording of the interview was also played for the jury.

J.'s statements to the police were admissible for impeachment as prior inconsistent statements. (See Evid. Code, §§ 1235, 770.) J.'s statements to the police were probative because they were made shortly after the murder before he was subjected to the influence of family members. In addition, the evidence was relevant to show that K. was in Ward's care and custody on the day of the murder which was a critical issue in the murder as well as an element of the charged offense of assaulting a child causing death. (§ 273ab; see *People v. Malfavon* (2002) 102 Cal.App.4th 727, 735-736.) In addition, no reasonable person would conclude that the evidence that Ward disciplined K. by spanking her on occasion rises to the level of showing a criminal disposition to inflict serious bodily injury.

### *No Error in Failing to Give Unanimity Jury Instruction*

Ward contends the trial court's failure to give a unanimity instruction deprived him of his constitutional right to a unanimous verdict on the felony murder. He argues that a unanimity instruction was required because there was evidence of two acts of sexual penetration which could have supported the charge, penetration of the anus and penetration of the vagina. We disagree.

A criminal defendant has the right to a unanimous jury verdict on a specific charge. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Collins* (1976) 17 Cal.3d 687, 693.) The unanimity instruction prevents the jury from reaching a guilty verdict by "amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) When evidence suggests that more than one criminal act may have been committed, the trial court must instruct the jury that it must unanimously agree on the crime which has been committed. (*Russo,* at p. 1132; CALCRIM No. 3500.)

A unanimity instruction, however, is not required when the evidence shows multiple acts in a continuous course of conduct. (*People v. Jennings* (2010) 50 Cal.4th

11

616, 679.)  Also, the instruction is not required "when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them."  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; see also *People v. Benavides* (2005) 35 Cal.4th 69, 98.)  "In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction."  (*People v. Russo, supra,* 25 Cal.4th at p. 1135.)

Here, Ward's assault consisted of a series of catastrophic acts of abuse in the home during a relatively short period of time.  All of the acts were so closely connected as to be part of a continuous course of conduct.  And, Ward offered the same defense to all of the assaultive acts, namely to place blame on the responding police officer, medical personnel, and others with access to K.  Neither the evidence nor the defense theories presented would have offered the jurors a reasonable basis in which to disagree on which act the defendant committed and still convict him of the crime.  (See *People v. Champion* (1995) 9 Cal.4th 879, 932.)

*No Error in Failing to Instruct on Lesser Included Offenses*

Ward contends that the trial court erred by failing to instruct the jury on second degree murder and voluntary manslaughter.  He argues that, by alleging murder with malice aforethought in the original information, Ward was required to defend himself against the lesser included offenses of murder with malice and entitled him to jury instructions on those offenses.  He acknowledges that the malice-based murder allegation was deleted from the information before trial, but claims the deletion did not alter the "expectations created by the original information."  We disagree.

A trial court has a duty to instruct on the general principles of law closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.)  An accusatory pleading gives notice to the defendant that the prosecution intends to

12

prove all the elements of any lesser necessarily included offense of the charged offense and that the defendant must be prepared to defend against such offenses. (*People v. Birks* (1998) 19 Cal.4th 108, 118.) Accordingly, due process requires a trial court to instruct the jury on lesser necessarily included offenses when there is a question whether all elements of the charged offense are present but substantial evidence justifying conviction of a lesser offense. (*People v. Gray* (2005) 37 Cal.4th 168, 219.)

Undisputedly, second degree murder and voluntary manslaughter are lesser included offenses of first degree murder committed with malice. (*People v. Taylor* (2010) 48 Cal.4th 574, 623.) Malice will be implied when the killing results from an intentional act which is dangerous to life and the killer knows that his conduct endangers the life of another and acts with conscious disregard for life. (*Id.* at pp. 623–624.) Conversely, malice is not required for first degree felony murder, and there is no authority that second degree murder or voluntary manslaughter are lesser included offenses of first degree felony murder. (*People v. Cavitt*, *supra,* 33 Cal.4th at p. 197; see also *Taylor, supra*, at p. 623 [expressly leaving question open].)

Here, the original information alleged that Ward had committed murder with malice aforethought citing section 187. The information also included a section 190.2, subdivision (a) special circumstance allegation that the murder was committed while Ward was engaged in the commission of rape by instrument. (§ 190.2, subd. (a)(17).) Prior to trial, the prosecutor informed the trial court and Ward that the prosecution was proceeding solely under a felony murder theory and not a first degree malice murder theory. Over Ward's objection, the trial court amended the information to eliminate the malice-based murder charge. The first sentence of the information which alleged that Ward murdered K. "unlawfully, and with malice aforethought" was amended to delete the "with malice aforethought" language so that it read that Ward murdered K. "unlawfully . . . while the said defendant was engaged in the commission of the crime of forcible sexual penetration (rape by instrument), a felony in violation of Penal Code section 289." The separately alleged section 190.2, subdivision (a)(17) special circumstance remained in the information.

13

In *People v. Anderson* (2006) 141 Cal.App.4th 430 (*Anderson*), the defendant was charged with first degree murder with malice but, after the close of evidence, the prosecution amended the information to charge felony murder. The defendant, however, was never charged with the predicate offense for the felony murder. (*Id*. at p. 445.) The trial court instructed the jury on felony murder, but gave no instructions on first degree murder with malice or second degree murder or voluntary manslaughter. The defendant was convicted of felony murder.

*Anderson* held that the defendant was entitled to instructions on second degree murder and voluntary manslaughter. (*Anderson, supra,* 141 Cal.App.4th at p. 445.) The court stated that, "[i]f the original charge of murder remained, the sua sponte duty to instruct as to lesser offenses did as well. Even if felony murder had been intended to replace the existing charge, an amendment made at the close of evidence does not satisfy the notice function that underpins the duty of sua sponte instruction. [Citation.] Having established the expectation that instruction on lesser included offenses of murder would be given, if supported by the evidence, the prosecution could not defeat that expectation by amendment after the close of evidence." (*Id.* at pp. 445–446.)

*Anderson* is readily distinguishable from this case. Although the accusatory pleadings in both *Anderson* and the instant case initially charged murder with malice, the malice language was deleted in the instant case before trial. In *Anderson,* the prosecution tried the case on both felony murder and malice murder theories and the information was not amended until the conclusion of the evidentiary phase of trial. And, in *Anderson,* the defendant was never charged with the predicate felony to support the felony murder theory as was the case here. In short, Ward knew he was not required to defend himself against a murder with malice charge and could have had no expectation that instructions on lesser included offenses to malice murder would be given.

Furthermore, a second degree murder instruction was not warranted because the evidence shows that the murder was committed while Ward was engaged in rape by instrument. "Where the evidence points indisputably to a killing committed in the perpetration of one of the felonies section 189 lists, the *only* guilty verdict a jury may

14

return is first degree murder. . . . Under these circumstances, a trial court 'is justified in withdrawing' the question of degree 'from the jury' and instructing it that the defendant is either not guilty, or is guilty of first degree murder." (*People v. Mendoza* (2000) 23 Cal.4th 896, 908–909.) In addition, because the elements of felony murder and the special circumstance coincide, the true finding as to the special circumstance establishes that the jury would have convicted Ward of first degree murder under a felony murder theory, regardless of whether more extensive instructions were given on second degree murder and voluntary manslaughter. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328.)

*No Ineffective Assistance of Counsel*

Ward claims he received ineffective assistance of counsel with respect to his trial counsel's (1) failure to object to admission of testimony from Dr. Whiteman concerning the conclusions of other nontestifying pathologists, (2) failure to object to admission of Ward's prior acts of disciplining K., (3) failure to request a unanimity instruction, and (4) failure to request jury instructions on lesser included offenses. Based on our conclusion that there were no errors, the ineffective assistance claims have no merit.

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.


15

Michael E. Pastor, Judge

Superior Court County of Los Angeles

_____

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi, Daniel C. Chang, David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.